# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Joel Marvin Munt, | **Case No. 16-cv-1206 (SRN/SER)** |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Minnesota Department of Corrections, Tom Roy, Gloria H. Andreachi, Bruce Julson, Steve Hammer, and Bruce Reiser, | |
| Defendants. | |

STEVEN E. RAU, United States Magistrate Judge

This matter comes before the undersigned on Defendants Minnesota Department of Corrections, Tom Roy, Gloria H. Andreachi, Bruce Julson, Steve Hammer, and Bruce Reiser's ("Defendants") Motion for Summary Judgment [Doc. No. 69] and Plaintiff Joel Marvin Munt's ("Munt") Motion for Summary Judgment [Doc. No. 76]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that Defendants' Motion for Summary Judgment be granted in part and denied in part, Munt's Motion for Summary Judgment be denied and this case be dismissed.[1]

---

[1]     For clarity, Defendants' Motion for Summary Judgment is denied in part because Rule 56 of the Federal Rules of Civil Procedure is not the proper procedural mechanism for some claims because these claims are not being decided on the merits. Instead, the Court addresses these aspects of the Defendants' motion related to Munt's Complaint [Doc. No. 1] *sua sponte* under Rule 12 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1915. That is, the Court's denial of Defendants' Motion for Summary Judgment is not premised on a finding that Munt has established a genuine issue of material fact.

## I.    BACKGROUND[2]

Munt is an inmate at Minnesota Correctional Facility Stillwater ("MCF-STW"). *See* (Compl. at 1). In his Complaint, Munt asserts a cause of action under 42 U.S.C. § 1983 grounded on allegations that the Defendants failed to reasonably accommodate his religious beliefs in violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and article 1, section 16 of the Minnesota Constitution. *See* (*id.*). In particular, Munt asserts that as a member of the Christian faith, his "deeply held religious beliefs include a prohibition against indecent displays." (*Id.* at 4). Indecent displays include changing clothes in front of others, sharing a cell, and using a toilet or shower in a public area. (*Id.*). Because the prison cells at MCF-STW allow corrections officers to view inmates in their cells, Munt hangs a privacy sheet in his cell when changing, using the toilet, or using the faucet to give himself a "bird bath." *See* (*id.* at 4–6). Furthermore, Munt refrains from using the showers as he is "totally exposed to anyone looking down" on him. *See* (*id.* at 5). Munt understands that hanging his privacy sheet is a violation of MCF-STW policy, and fears that he will be retaliated against for the exercise of his religious beliefs. *See* (*id.* at 5–6, 12–13) (alleging that "[f]ailure to accommodate has caused a great deal of fear of punishment and has forced this suit"). As part of his Complaint, Munt asserts that Defendants' stated security concerns are unfounded because Minnesota Correctional Facility Oak Parts Heights ("MCF-OPH")—another facility in which Munt has been incarcerated—"has private showers." *See* (*id.* at 13). Munt seeks declaratory judgment and injunctive relief regarding these issues and that Defendants be ordered to pay unspecified damages to Munt on the basis of Munt bringing this lawsuit. *See* (*id.* at 13–15) (asking that Defendants "jointly and separately . . . reimburse" Munt for bringing this lawsuit).

---

[2]    Munt's filing activity in this case is extensive. As a result, the Court only references those issues that are relevant to the adjudication of the pending motions before the Court.

Before bringing this action—and in an attempt to allay his fears of retaliation—Munt filed various kites, a grievance, and an appeal with Defendants regarding the use of his privacy sheet and shower access. *See* (*id.* at 7–11). In response, Defendants proposed alternatives that would prevent indecent displays and comport with safety and security considerations at MCF-STW. *See, e.g.*, (*id.* at 10) (suggesting the use of towel to address modesty concerns when using the toilet). The end result of this grievance process was Defendants' statement that Munt's religious beliefs were accommodated, that the safety and security interests of the institution prevented them from making any additional accommodations, and that proposed alternatives addressed his religious beliefs against indecent displays. (*Id.* at 11). Munt alleges that his concerns regarding indecency are exacerbated by being in a cell with another inmate (i.e., double-bunking). (*Id.* at 4) (stating that "[w]hen sharing a cell, it is one room and there is no privacy . . . (even with a privacy sheet it is inadequate in this situation)"). That being said, Munt did not appear to raise his double-bunking concerns through kites and first raises the issue in a grievance to Defendant Steve Hammer. *See* (*id.* at 7–8) (submitted kites); (*id.* at 9) (grievance); (*id.* at 10–11) (appeal).

### A.    Prior Motions for Injunctive Relief

Munt filed his First Motion for Temporary Restraining Order Pursuant to Fed. R. Civ. P. 65(b) ("Motion for TRO") [Doc. No. 3], and First Motion for Expedited Preliminary Relief Pursuant to Fed. R. Civ. P. 65(a) ("Motion for Expedited Relief") [Doc. No. 5] (collectively "Motions for Preliminary Relief"). This Court analyzed Munt's allegations under *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981), in recommending that

Munt's Motions for Preliminary Relief be denied.[3] *See* (R&R Dated Jan. 27, 2017, "R&R") [Doc. No. 52 at 6–17]. This Court concluded that "all *Dataphase* factors weigh against granting Munt's Motions for Injunction Relief" and "recommend[ed] denying his Motion[s]." (*Id.* at 17).

More specifically, this Court determined that Munt's claims were too speculative to demonstrate irreparable injury and that the probability of success on the merits did not warrant the relief sought. *See* (*id.* at 10–11, 13–16). With respect to success on the merits, this Court concluded that Munt had failed to substantiate a substantial burden under RLUIPA, which "is fatal to his ability to show success on the merits." (*Id.* at 16). Munt objected to the Report and Recommendation. *See* (Pl.'s Objs. to Magistrate's Jan. 27, 2017 R&R) [Doc. No. 54]. In addition to objecting, Munt submitted two self-styled supplements that Munt asserted provided updated factual information relevant to the adjudication of his objection. *See* (Suppl. to Pl.'s Objs. to Magistrate's Jan. 27, 2017 R&R) [Doc. No. 56]; (Suppl. 3 to Pl.'s Objs. to Magistrate's Jan. 27, 2017 R&R) [Doc. No. 59]. "Because it appeared from the Supplements that changes had been made to the shower facilities since the initial round of briefing, the Court directed Defendants to submit a supplemental affidavit addressing the new facts in Plaintiff's Supplements." (Mem. Opinion & Order Dated Mar. 29, 2017, "Judge Nelson's Order") [Doc. No. 67 at 7].

As requested, Defendants submitted a supplemental affidavit to which Munt filed an objection and his own affidavit. *See* (Aff. of John Quist, "Quist Aff.") [Doc. No. 63]; (Objs. to Quist Aff.) [Doc. No. 64]; (Aff. of Joel Munt) [Doc. No. 65]. John Quist ("Quist"), currently the Program Director at MCF-STW, avers that Munt's request to allow Munt to shower in another unit could not be accommodated because Munt is housed based on work assignment. *See* (Quist

---

[3]    The *Dataphase* analysis consists of weighing several factors: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest." 640 F.2d at 113.

4

Aff. ¶¶ 1, 16). Specifically, Quist asserted, based on MCF-STW's policy of "controlled movement, . . . where inmates from one unit move at a time," that Munt's request to shower in another unit "would require additional staff and time to move one offender to another unit to shower." (*Id.*). With respect to Munt's request for individualized shower time, Quist states "[t]his special treatment would place a burden on officer schedules, officer postings, controlled movements, and other offenders' flag time. If Munt wants to shower in a different unit, he can bid for another job and move units." (*Id.* ¶ 17). Lastly, Quist unequivocally states "[a]n individual shower in Munt's cell is not an option. None of the units at MCF-STW have this option. Remodeling one cell in A-East would go against MCF-STW policy and place a substantial burden on personnel and costs." (*Id.* ¶ 18). Quist also avers that staff at MCF-STW do make some showering accommodations—namely for transgendered inmates—on the basis of safety and security concerns, because "[t]ransgender offenders have a significantly higher risk of being attacked in the shower." (*Id.* ¶ 20).

Munt's objections to the Quist Affidavit range from objections regarding his ability to adequately address the contents of the Affidavit, disagreements with Quist regarding the nature of whether the shower stalls adequately obstructs inmates from being observed by prison staff, and arguing that Defendants have provided nothing beyond bare assertions with respect to this issue. *See generally* (Objs. to Quist Aff.). Furthermore, Munt disclaims Quist's proposed accommodations of showering in a different unit because this alternative does not "meet [his] privacy needs."[4] (*Id.* ¶ 12).

---

[4]    Munt does not specifically address whether the transgender policy would meet his needs, but seems to inferentially disregard it as a viable option. *See* (Objs. to Quist Aff. ¶15) (stating if they make accommodations for others based on their status as transgender inmates, they should also make his requested accommodations).

Conducting a *de novo* review, Judge Nelson adopted the Report and Recommendation as modified in light of the original briefing and supplemental submissions by the parties. *See* (Judge Nelson's Order at 1–2, 7). In particular—agreeing with the Report and Recommendation—Judge Nelson concluded that Munt's allegations of shower access and double-bunking were too speculative to constitute irreparable injury. *See* (*id.* at 14–16). Judge Nelson disagreed, however, that Munt has not established a threat of irreparable harm with respect to his privacy sheet. *See* (*id.* at 13–14, 16). With respect to likelihood of success on the merits—sustaining Munt's objection in part—Judge Nelson determined that Munt was substantially burdened by the Defendants' policy regarding privacy sheets but that "while this case is in its early stages, Defendants are likely to establish that prohibiting Munt from hanging a privacy sheet in his cell is the least restrictive means of furthering the compelling governmental interest in his safety and security." *See* (*id.* at 18, 23).

### B.    Motions for Summary Judgment[5]

#### 1.    Munt's Submissions

Munt asserts that his beliefs against indecent displays are sincerely held and that if he is not allowed to maintain his privacy sheet, is forced to shower, or is moved into a multiple-occupancy cell, his beliefs would be substantially burdened. *See* (Pl.'s Mem. in Supp. at 9–16). Munt further argues that because he has substantiated his burden with respect to his beliefs being

---

[5]    The Court has reviewed all of the parties' submissions in this case. For clarity and brevity, the Court does not address duplicative arguments that are raised in the briefing of the issues before the Court. For example, in replying to Defendants' Response to Plaintiff's Motion for Summary Judgment ("Defendants Memorandum in Opposition") [Doc. No. 87], Munt asserts similar arguments to those raised in Plaintiff's Memorandum in Support of His Motion for Summary Judgment ("Plaintiff's Memorandum in Support") [Doc. No. 77]. Namely, Defendants have failed to assert any evidence that raise their safety and security concerns above mere speculation. *See generally* (Pl.'s Reply to Def.'s Resp. to his Mot. for Summ. J., "Pl.'s Reply") [Doc. No. 96]; *see also* (Pl.'s Mem. in Supp. at 17–27). The Court describes arguments raised in multiple submissions only once, typically in the context of Munt's Memorandum in Support.

sincerely held and that his beliefs are substantially burdened, the burden shifts to Defendants to demonstrate a compelling governmental interest. *See* (*id.* at 17–18).

With respect to the prohibition against privacy sheets, Munt argues that Defendants have not alleged any facts to support their argument that privacy sheets prevent conduct that Defendants suggest the policy is designed to mitigate, such as tattooing, making alcoholic drinks, engaging in sexual behaviors, or attempting escape. *See* (*id.* at 18–19). In particular, Munt asserts that "[Defendants] can show no incident where a privacy sheet furthered any of these activates." (*Id.* at 19). With respect to tattooing, Munt alleges that "if they actually sought to prevent tattooing they would have to be rid of double bunking" because "[t]hat is a common method by which prisoners appear to get tattoos." (*Id.* at 19) (emphasis omitted). Regarding the making of alcoholic drinks, Munt asserts that this rationale is "so absurd" that he does not know what to say. *See* (*id.*). Munt therefore believes "[t]here has to be a rational connection and it just isn't there." (*Id.*). With respect to preventing sexual behavior, Munt asserts this reasoning "is just a post hoc rationalization to try and justify the policy." (*Id.* at 20). Here, Munt raises arguments similar to those related to tattooing; that if the Defendants really wanted to prevent sexual activity they would prevent double-bunking. *See* (*id.*). Lastly, as it relates to preventing attempts at escape, Munt asserts that hanging a sheet would be counterproductive because "[a] raised sheet draws attention . . . . Certainly a lookout would be more practical." (*Id.*).

As evidence in support of his Motion for Summary Judgment, Munt submitted an affidavit. *See* (Aff. of Joel Munt in Supp. of Pl.'s Mot. for Summ. J., "Munt Aff. in Supp.") [Doc. No. 78]. Munt's affidavit is almost identical to portions of his supporting brief. *Compare* (Munt Aff. in Supp.) (containing twenty-three paragraphs), *with* (Pl.'s Mem. in Supp. at 7–9) (including nineteen paragraphs that are either identical to or differ slightly when compared with

the first nineteen paragraphs in Munt's Affidavit in Support). In particular, much of his affidavit is devoted to establishing his religion; that his beliefs are sincerely held; that Defendants' policies substantially burden his sincerely held religious beliefs; and Defendants have indicated through the grievance process that they will not accommodate his religious beliefs. *See* (Munt Aff. in Supp. ¶¶ 1–9, 13–14, 19). Munt also states that certain showers at MCF-OPH will accommodate his modesty concerns, which demonstrates that showers at MCF-STW can be modified while still maintaining the safety and security interests of the prison, that the use of "privacy sheets are already widely used" at MCF-STW and the widely used "practice of guards asking if [an] inmate is okay when a privacy sheet is up" has led to no incidents of which Munt is aware and that "Defendants have disavowed knowledge of such incidents." (*Id.* ¶¶ 11, 15–17). Munt also asserts that he only uses his privacy sheet as needed "to use the toilet, change clothes, and bath[e]" and that when he is done with these tasks, "the obstruction is removed." (*Id.* ¶ 22). The remaining portion of Munt's Affidavit discusses recent changes to the showers at MCF-STW and how those changes do not address his sincerely held religious belief against indecent displays because the interior of the stalls remain visible from certain vantage points within the prison.[6] (*Id.* ¶¶ 20–21, 23).

Munt also filed multiple self-styled supplements to his Motion for Summary Judgment: one each on July 20, 2017, August 21, 2017, November 20, 2017, and the last on November 29, 2017.[7] *See* (Suppl. to Summ. J. Aff., "Privacy Sheet Suppl.") [Doc. No. 103]; (Suppl. Two to

---

[6]    It is unclear whether these recent changes to which Munt refers are the changes mentioned in the Quist Affidavit or are additional changes for other reasons. *See* (Quist Aff. ¶ 4) ("Showers in the other units at MCF-STW are going to be remodeled to look like the showers in A-East."). Regardless, the motivation for the changes is largely irrelevant to this Court's analysis.

[7]    All supplements were submitted after the Court-ordered deadline for Munt to respond. *See* (Text Only Order Dated May 10, 2017) [Doc. No. 85] (ordering Munt to respond to

Summ. J. Aff., "Double Cell Suppl.") [Doc. No. 105]; (Emergency Suppl. to Summ. J. Aff. "Second Double Cell Suppl.") [Doc. No. 112]; (Second Emergency Suppl. to Summ. J. Aff., "Third Double Cell Suppl.") [Doc. No. 114]. With respect to the Privacy Sheet Supplement, Munt provided a copy of a memo sent by Defendant Gloria Andreachi ("Andreachi") to all inmates, which Munt asserts demonstrates that "the privacy sheet ban was not previously enforced" because Andreachi's memo states that the new policy will be "[e]ffective immediately." *See* (Privacy Sheet Suppl. at 1); *see also* (Memo, Attached to Privacy Sheet Suppl.) [Doc. No. 103-1].[8] Munt further provides a sworn statement that he asserts reveals "less restrictive alternative[s]," although these statements appear to evidence occasions in which certain guards did not allegedly require that Munt take down his privacy sheet. *See* (Privacy Sheet Suppl. at 1, 2).

With respect to the Double Cell Supplement, Munt asserts that he has limited job opportunities (primarily working for building management as a "swamper") due to his poor eyesight and "inability to work on Saturdays due to my religious beliefs." *See* (Double Cell Suppl. at 1). Furthermore, Munt "had been told that Building Maintenance workers will be moving to another unit." (*Id.*). Munt asserts this "means that [he] will almost certainly be placed in a double cell again—which [he] will refuse." (*Id.*).

Lastly, in his emergency supplements, Munt asserts that he is now double-bunked and will be "for at least 30 days." (Third Double Cell Suppl. at 1); *see also* (Second Double Cell

---

Defendants' Motion for Summary Judgment on or before July 1, 2017); (Text Only Order Dated May 25, 2017) [Doc. No. 89] (establishing the same July 1, 2017 deadline for Munt to file a reply to Defendants' Response); (Order Dated June 29, 2017) [Doc. No. 100] (Judge Nelson denying as moot Munt's objections [Doc. No. 92] related to his deadlines for responding to Defendants' submissions). Nevertheless, in the interest of thoroughness, the Court considers these supplements in its analysis.

[8]    When referencing the supplements, CM/ECF pagination is used.

Suppl. ¶ 2). Furthermore, Munt asserts that he is "frequently forced to take my privacy sheet down and even when up [he] almost always ha[s] a cellmate in the room, making it indecent even with the sheet." (Third Double Cell Suppl. at 2). Lastly, Munt asserts that when he asked Quist about the single-cell-occupancy request, Quist "had no knowledge such a procedure existed." (*Id.* at 1).

### 2.    Defendants' Submissions

Defendants argue that the Eleventh Amendment bars Munt's claims for damages against Defendants in their official capacities and that those claims should be dismissed. (Defs.' Mem. of Law in Supp. of Mot. for Summ. J., "Defs.' Mem. in Supp.") [Doc. No. 70 at 9–10]. In support, they assert that a suit against an individual in their official capacities is a suit against the state and that "Congress did not abrogate immunity to claims for damages in passing RLUIPA, and Minnesota had not consented to suit." (*Id.*). Defendants also argue that RLUIPA does not provide a cause of action against Defendants in their individual capacities and so those claims should also be dismissed. (*Id.* at 10–12).

On the merits of Munt's remaining claims in his Complaint, Defendants assert that Munt failed to establish violations under RLUIPA or the Minnesota Constitution. (*Id.* at 12–24). As it relates to Munt's claims regarding the use of a privacy sheet, Defendants argue that Munt failed to establish any viable alternatives and "[t]he least restrictive means to further the safety and security of offenders, officers, and the facility is prohibiting offenders from obstructing the fronts of their cells with sheets." (*Id.* at 16–17).

Regarding access to the showers, Defendants assert that the presence of shower stalls at MCF-OPH that allegedly meet Munt's criteria are only one consideration and not dispositive as to whether the Defendants have failed to demonstrate that the design of the shower doors at

MCF-STW are the least restrictive means of satisfying their compelling governmental interests of safety and security. (*Id.* at 18–19). To that end, Defendants argue they have substantiated their compelling interest related to prison safety and security because the showers are designed to meet the mandated standards under the Prison Rape Elimination Act of 2003 ("PREA"). *See* (*id.* at 4–6, 19). Furthermore, Defendants argue that Munt's request for a private shower in his cell presents a number of concerns, ranging from violations of prison policy against the remodeling of one cell, to safety and security concerns regarding the staffing of individualized shower time, to logistical issues if Munt were to move. *See* (*id.* at 20–21).

With respect to Munt's requirements regarding single-cell occupancy, Defendants argue that Munt has not exhausted his administrative remedies in this regard. (*Id.* at 22–24). Specifically, Defendants argue that Munt failed to follow the proper procedure for exhausting his claim because he did not follow the proper chain of command, and instead "first asked for a single cell restriction in his second kite to Defendant [Steve] Hammer." (*Id.* at 23). In this respect, Defendants also assert that Munt's grievances were improper. *See* (*id.* at 23–24). For these reasons, Defendants assert that Munt's claims related to single- and double-bunking should be dismissed.

To the extent Munt's Complaint could be construed to raise more generic claims arising under the First Amendment, Defendants argue that RLUIPA provides a more strict test than traditional First Amendment analysis and therefore anything that is deemed to meet RLUIPA standards must necessary pass constitutional muster under general First Amendment principles.[9] *See* (*id.* at 24).

---

[9]      Because Munt did not raise traditional First Amendment claims, the Court does not address Defendants' alternative arguments in this respect. *See* (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., "Pl.'s Mem. in Opp'n") [Doc. No. 97 at 47].

In support of their Motion for Summary Judgment, Defendants submitted three additional affidavits. *See* (Aff. of Steven Ayers, "Ayers Aff.") [Doc. No. 71]; (Second Aff. of Gloria Andreachi, "Second Andreachi Aff.") [Doc. No. 72]; (Aff. of Bruce Julson, "Julson Aff.") [Doc. No. 73].[10] The Ayers Affidavit discusses the nature of the showers at MCF-OPH. *See generally* (Ayers Aff.). In particular, Ayers asserts that

> MCF-OPH shower doors are not full length doors. The shower doors have openings at the top and bottom of the door. Officers must be able to see offenders' feet when they are showering. Being able to see offenders' feet is to ensure that only one offender is in a shower stall at a time.

(*Id.* ¶ 5). The Andreachi Affidavit addresses Munt's single- and double-bunking history while at MCF-STW. *See generally* (Second Andreachi Aff.). Andreachi avers that "[s]ince September 23, 2015, Munt has resided in a single-occupancy cell." (*Id.* ¶ 3). Furthermore, Andreachi asserts that Munt "currently does not have a single-cell occupancy restriction. If Munt wants to have a single-cell occupancy restriction, he would need to submit a request. MCF-STW staff review offender requests for single-occupancy restrictions" and that "Munt has not requested a single-cell occupancy restriction since he arrived at MCF-STW." (*Id.* ¶¶ 5–6).

The Julson Affidavit addresses a number of different topics including Munt's requests for exceptions to the privacy sheet policy, MCF-STW's single- and double-bunking policy, and the shower remodel conducted to comply with PREA's standards. *See generally* (Julson Aff.). With respect to the privacy sheet policy, Julson stated that

> Before MCF-STW implemented the DOC and PREA privacy sheet policies, part of offender cells used to be partially blocked. During this time, I recall numerous incidents when offenders engaged in self-injurious behavior such as cutting,

---

[10]    In the briefing of the issues related to Munt's Motions for Preliminary Relief, Defendants had previously submitted the Affidavit of Gloria Andreachi ("First Andreachi Affidavit") [Doc. No. 28] and the Quist Affidavit, which the Court has also considered and uses below in its analysis.

offenders were attacked, raped, and some offenders committed suicide by hanging themselves directly behind the portion of the cell bars that were blocked.

(*Id.* ¶ 5). Furthermore, Julson asserted

As Program Director I also had concerns about the safety and security risks privacy sheets posed to officers such as an offender attacking an officer and bringing him or her into his cell and out of view of the cameras and other officers. If officers saw a privacy sheet and did not instruct the offender to remove it and ensure that offender removed it, the officer would be disciplined.

(*Id.* ¶ 7). With respect to the shower remodel, Julson averred

The A-East showers were remodeled to conform to PREA standards. I was on the MCF-STW PREA Committee as we were preparing for the required PREA audits. PREA is a federal act with the purpose of protecting, reducing, and eliminating prison rape. PREA requires that all correctional facilities comply with certain standards. The MCF-STW PREA Committee reviewed the PREA standards, discussed any changes or additions to standards, implemented the standards, and participated in the PREA auditing process. . . . MCF-STW's A-East shower design and remodel were completed and approved by the DOC to comply with PREA's purpose and its standards.

(*Id.* ¶ 12). Finally, as it relates to the bunking policy at MCF-STW, Julson stated he does not recall "Munt ever [sending him] a kite on his single cell occupancy concerns" and

Offenders who have single occupancy status generally move to a new single occupancy cell and it is uncommon to lose this status. Cell assignments can be influenced in part by safety and security concerns and offenders' disciplinary records. Before an offender would lose his single cell occupancy status MCF-STW staff would meet, discuss, and then make a determination is [sic] he should retain a single cell.

(*Id.* ¶¶ 9, 11). Julson concluded that "[d]uring my time as Program Director, no religious accommodations were approved that allowed offenders to hang privacy sheets or to receive individualized showering privileges." (*Id.* ¶ 14). Julson admitted, however, that transgender inmates "had approved showering accommodations at MCF-STW" because "[t]ransgender offenders have a significantly higher risk of being attacked in the shower." (*Id.* ¶ 15); *see also* (Quist Aff. ¶ 20).

## II.    DISCUSSION

The Court recommends that Defendants' Motion for Summary Judgment be granted in part and denied in part and Munt's Motion for Summary Judgment be denied because Munt has failed to sustain his burden demonstrating that Defendants' policies are not the least restrictive means of furthering their compelling safety and security interests.[11] Thus, no reasonable jury could return a verdict in favor of Munt on his claims.

### A.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis omitted). "[A] dispute about a material fact is genuine if a reasonable jury could return a verdict in favor of either party." *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988). The court views the evidence and makes all reasonable inferences in favor of the nonmoving party. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 474 (8th Cir. 2005).

To support its argument, the moving party must cite to record materials or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). "Once the moving party has made and supported their motion, the nonmoving party must proffer

---

[11]    Relatedly, Defendants have established that safety and security is a compelling governmental interest and that their policies are the least restrictive means of furthering their safety and security interests. As a result, summary judgment in Defendants' favor is appropriate.

admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011).

### B.    Analysis

Munt has asserted individual capacity claims and official capacity claims for both monetary damages and injunctive relief based on violations of RLUIPA and the Minnesota Constitution.[12] The Court addresses each category of claims under RLUIPA in turn.

### 1.    Individual Capacity Claims

The Eighth Circuit has not squarely addressed the issue, but this District has held that "RLUIPA does not create a cause of action against persons in their individual capacities." *Brooks v. Roy*, No. 12-cv-316 (SRN/JSM), 2014 WL 127024, at *16 (D. Minn. Jan. 14. 2014) (Mayeron, Mag. J., as adopted by Nelson, J.) Arguably, summary judgment is not the proper procedural vehicle to dispense with these claims. *Id.* As a result, Defendants' Motion for Summary Judgment should be denied in this respect.[13] Nevertheless, because Munt proceeded in

---

[12]    This Court only addresses Munt's claims under 42 U.S.C. § 1983 alleging violations of RLUIPA and does not specifically address Munt's allegations arising under the Minnesota Constitution. Specifically, because this Court recommends that Defendants' Motion for Summary Judgment be granted in part and because this Court recommends dismissal *sua sponte* of Munt's other RLUIPA claims not dispensed with on summary judgment, this Court correspondigly recommends that the Court not exercise supplemental jurisdiction on the remaining state law claims. *See Gregoire v. Class*, 236 F.3d 413, 419–20 (8th Cir 2000) ("[W]hen state and federal claims are joined and all federal claims are dismissed on a motion for summary judgment, the state claims are ordinarily dismissed without prejudice to avoid needless decisions of state law. . . as a matter of comity . . . . We stress the need to exercise judicial restraint and avoid state law issues wherever possible." (internal quotation marks omitted) (first omission in original)).

Even if the Court were to address Munt's claims arising under the Minnesota Constitution, they should be dismissed because there is no private right of action under the Minnesota Constitution for Munt's claims. *See Jihad v. Fabian*, No. 09-cv-1604 (SRN/LIB), 2011 WL 1641767, at *3 (D. Minn. May 2, 2011) (Nelson, J.).

[13]    While Defendants request that the Court dismiss certain of Munt's claims, Defendants only moved for summary judgment under Rule 56. *See* (Mot. for Summ. J.). As a result, the

this case *in forma pauperis* ("IFP"), his claims are subject to *sua sponte* dismissal at any time. *See* 28 U.S.C. § 1915(e); *see also* (Order Dated July 19, 2016) [Doc. No. 13] (granting Munt's application for IFP status). Because Munt can never successfully assert RLUIPA claims against the Defendants in their individual capacities, these claims "should be dismissed with prejudice." *Brooks*, 2014 WL 127024, at *16.

### 2.    Official Capacity Claims for Monetary Damages

The law is well-settled:

> [The Eleventh Amendment] deprives a federal court of power to decide certain claims against States that otherwise would be within the scope of Art. III's grant of jurisdiction. For example, if a lawsuit against state officials under 42 U.S.C. § 1983 alleges a constitutional claim, the federal court is barred from awarding damages against the state treasury even though the claim arises under the Constitution.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119–20 (1984). Furthermore, "[a] suit against state employees in their official capacities is the functional equivalent of a suit against the State." *Zajrael v. Harmon*, 677 F.3d 353, 355 (8th Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (stating that claims against a government-entity employee in the employee's official capacity are considered claims against the government entity). Importantly, Minnesota enjoys immunity from suit under 42 U.S.C. § 1983. *See Grover-Tsimi v. State of Minn.*, 449 F. App'x 529, 530 (8th Cir. 2011) (per curiam). Furthermore, the application of claims premised on RLUIPA violations does not change this analysis. *See Sossamon v. Texas*, 563 U.S. 277, 293 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and

---

Court treats this language as a request for summary judgment and not to dismiss the claim under Rule 12.

unequivocally includes such a waiver."); *see also Zajrael*, 677 F.3d at 355 (citing *Sossamon* when finding that plaintiff had no claims for monetary damages against defendants in their official capacities under RLUIPA).

Summary judgment on these claims, however, is not appropriate under the circumstances. *See Walker v. Foster*, No. 10-cv-3096 (SRN/FLN), 2011 WL 3837122, at *1 (D. Minn. Aug. 30, 2011) (Nelson, J.) ("Immunity under the Eleventh Amendment, however, presents a jurisdictional question collateral to the merits. *Brown v. United States*, 151 F.3d 800, 803–04 (8th Cir. 1998). Accordingly, it is not appropriate for summary judgment. *Id.*").

Because Defendants move exclusively for summary judgment, Defendants' Motion for Summary Judgment should be denied in this respect. *See* (Mot. for Summ. J.); *see also Walker*, 2011 WL 3837122, at *1. Nonetheless, this Court may raise subject-matter jurisdiction *sua sponte*. *See* Fed. R. Civ. P. 12(h)(3); *see also* 28 U.S.C. § 1915(e) (allowing dismissal of claims for which relief cannot be granted at any time); *Fromm v. Comm'n of Veterans Affairs*, 220 F.3d 887, 890 (8th Cir. 2000) ("Under [Rule 12(h)(3)], either the court or any party may raise an issue of subject-matter jurisdiction at any time, and the Eleventh Amendment is regarded, at least for this purpose, as going to subject-matter jurisdiction."). As a result, the Court recommends that Munt's claims for damages against Defendants in their official capacity be dismissed *sua sponte*.

### 3.    Official Capacity Claims for Injunctive Relief

Under RLUIPA, the government cannot impose a substantial burden on the exercise of sincerely held religious beliefs unless the government can show the restriction is in furtherance of a compelling governmental interest and the restriction is the least restrictive means of furthering that interest. *See* 42 U.S.C. § 2000cc–1(a).

Specifically,

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Assuming without deciding that Munt has asserted a sincerely held religious belief that is substantially burdened, Defendants have established that the restrictions in place are the least restrictive means of furthering their compelling interests. Thus, Munt's alleged RLUIPA violations cannot support a finding that summary judgment should be grated in his favor.[14] Therefore, Munt's Motion for Summary Judgment should be denied and Defendants' Motion for Summary Judgment on Munt's remaining RLUIPA claims should be granted. The Court addresses each of Munt's alleged RLUIPA violations in turn.

### a.    Privacy Sheets

Defendants assert that the prohibition against hanging privacy sheets is designed to address the compelling safety and security interests inherent in preventing inmates from obstructing their activities from prison staff. *See* (Defs.' Mem. in Supp. at 16–18). Safety and security is a compelling state interest. *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) ("It bears repetition, however, that prison security is a compelling state interest . . . ."). The only

---

[14] The Court addresses many of Munt's arguments from the perspective of whether Defendants have met their burden to demonstrate there is no genuine issue of material fact that the challenged polices are the least restrictive means of furthering a compelling governmental interest. The Court could also conclude from the same evidentiary record that Munt has failed to meet his burden establishing there is no genuine issue of material fact as to whether the policies fail this least-restrictive-means test. Munt's failure to meet his burden would provide an independent basis for denying his Motion for Summary Judgment. *See City of Mt. Pleasant v. Ass'n Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (stating "the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor" (internal quotation marks omitted)).

question, therefore, is whether the prohibition against privacy sheets is the least restrictive means of furthering this compelling governmental interest. This Court concludes that it is.

First, if Munt were allowed exceptions to the zero-tolerance policy against the hanging of privacy sheets on the basis of his religious beliefs—taken to its logical extreme—entire prison populations could obfuscate their activities from prison officials on the basis of the same sincerely held religious beliefs that Munt espouses. That result would clearly be at odds with the holdings in *Cutter* and *Holt v. Hobbs. See Holt,* 135 S. Ct. 853, 866 (2015) ("We emphasize that although RLUIPA provides substantial protection for the religious exercise of institutionalized persons, it also affords prison officials ample ability to maintain security."); *Cutter*, 544 U.S. 709 at 722 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."). Thus, because the stated alternative has the potential of substantially undermining the Defendants' safety and security interests, this suggests that Defendants have demonstrated they lack "other means of achieving [their] desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Holt*, 135 S. Ct. at 864 (quotation marks omitted) (second alteration in original). Furthermore, as Defendants point out, asking if an inmate is okay does not achieve the requisite safety and security considerations because "[a]n offender could lie and say he is okay to cover up what he is doing or an offender may be forced to say he is okay" at the behest of another inmate. (Defs.' Mem. in Supp. at 17). That is, the question-answer alternative that Munt forwards is not an appropriate alternative because it does not address the underlying safety concern requiring that prison staff have an unobstructed view inside a prison cell.

Second, nothing in the Supreme Court's decision in *Holt*—upon which Munt heavily relies—suggests otherwise. *See, e.g.*, (Pl.'s Mem. in Supp. at 4–5, 6, 9–12, 14, 15, 18, 23, 30,

34). Specifically, *Holt* determined that the policy distinguishing between one-half-inch beards and one-quarter-inch beards could not be sustained on the basis of security and security interests. *See Holt*, 134 S. Ct. at 864 (stating "it is hard to swallow the argument that denying petitioner a [one-half]-inch beard actually furthers the Department's interest in rooting out contraband"). That is not the case here. Regardless of Munt's protestations to the contrary, there is simply no other way for prison officials to maintain prison security without having an unobstructed view into prisoners' cells. *See* (Julson Aff. ¶ 5) ("I recall numerous incidents when offenders engaged in self-injurious behavior such as cutting, offenders were attacked, raped, and some offenders committed suicide by hanging themselves directly behind the portion of the cell bars that were blocked."); (*id.* ¶ 6) ("For the safety and security of Munt, other offenders, staff, and the facility, officers must be able to see into offender cells . . . . Officers must be able to see if offenders are engaging in prohibited behaviors such as tattooing, making alcohol, sexual contact, beatings, self-injurious behavior, or are in need of medical attention."); *see also* (Ex. 2, "Offender Handbook," Attached to First Andreachi Aff.) [Doc. No. 28-2 at 7] (stating clothes that are left to dry "may **not** cover cell bars or obstruct the view into the cell" and "[n]o items may be used to block staffs [sic] view into the cell"); (First Andreachi Aff. ¶¶ 4–5) (discussing the safety and security interests behind the privacy sheet prohibition and that the Offender Handbook establishes there are no exceptions to this policy); (Ex. 4, Attached to First Andreachi Aff.) [Doc. No. 28-2 at 35] (an incident report demonstrating that a privacy sheet was used in an attempt to conceal hooch);[15] (Judge Nelson's Order at 21–22) (stating "the argument that the [Defendants'] interest in ensuring that their staff are afforded an unobstructed view into inmates' cells,

---

[15]    Document Number 28-2 contains multiple independently paginated exhibits. When referencing exhibits attached to the First Andreachi Affidavit, CM/ECF pagination is used.

20

including Munt's, is quite easy to take seriously. The reason for providing sight lines into all prisoners' cells, including Munt's, is integral to the prison's safety mission").

Also, as Judge Nelson noted, Munt's arguments related to the manner in which the policy is enforced is misplaced; "the most relevant inquiry is whether other exceptions exist, as the relief sought by Munt is in the form of an exception." (Judge Nelson Order at 23); *see also Holt*, 135 S. Ct. at 868 (Sotomayor, J. concurring) (stating "nothing in the Court's opinion suggests that prison officials must refute every conceivable option to satisfy RLUIPA's least restrictive means requirement"). Munt has provided no evidence to substantiate his claims that other exceptions exist to the general prohibition against hanging privacy sheets. Furthermore, Defendants have consistently and convincingly established that there are no exceptions to this policy. *See, e.g.*, (First Andreachi Aff. ¶¶ 4–5) (discussing the safety and security interests behind the privacy sheet prohibition and that the Offender Handbook establishes there are no exceptions to this policy); (Offender Handbook at 7) (stating clothes that are left to dry "may **not** cover cell bars or obstruct the view into the cell" and "[n]o items may be used to block staffs [sic] view into the cell"); (Julson Aff. ¶¶ 5–7) (describing harm that has occurred in the prison context when prison staff had obstructed views of inmates in their cells and that prison guards are disciplined if they do not enforce that privacy sheets are taken down).

*Fowler v. Crawford*, 534 F.3d 931 (8th Cir. 2008), is instructive. Specifically, *Fowler* states that one factor to be weighed under alleged violations of RLUIPA is whether the consideration of alternatives by prison officials implicates the least restrictive means for enforcing their safety and security interests. *Fowler*, 534 F.3d at 940 (citing *Spratt v. R.I. Dep't of Corr.*, 482 F.3d 33, 41 n.11 (1st Cir. 2007) (stating that "to meet the least restrictive means test, prison administrators generally ought to explore at least some alternatives")). In this regard,

the court in *Fowler* found that the plaintiff's "all-or-nothing position supports the prison officials' contention that an outright prohibition . . . is the least restrictive means of achieving the compelling interests of prison safety and security in this case." *Id.* at 938 (internal quotation marks omitted). Here, prison officials have suggested that Munt place a towel on his lap while using the toilet. *See, e.g.*, (Compl. 9–10) (response from Defendant Steven Hammer regarding Munt's grievance appeal); (First Andreachi Aff. ¶ 7).

Other courts have held that this accommodation generally satisfies concerns against indecent displays. *See, e.g.*, *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir. 1990) ("The use of a covering towel while using the toilet or while dressing and body positioning while showering or using a urinal allow the more modest inmates to minimize invasions of their privacy."); *Slevin v. McDonough*, No. 4:06-cv-390, 2008 WL 821930 at *5 (N.D. Fla. Mar. 27, 2008) (stating plaintiff "may comply with his beliefs by the use of a towel or blanket on his lap to shield himself from those who may be passing by his cell at that time"). Notwithstanding these overtures, Munt has taken an all-or-nothing posture. (Pl.'s Mem. Supp. at 7); (Munt. Aff. in Supp. ¶¶ 3–5). As a result, this also supports a finding that Defendants' absolute prohibition against obstructing the view within a cell is the least restrictive means for furthering their compelling safety and security interests. *See Fowler*, 534 F.3d at 940–41.

Munt's attempt to establish a genuine issue of material fact regarding whether privacy sheets have been used to perpetuate the activities that Defendants are attempting to mitigate are largely fruitless. "Prison officials need not endure assaults, drug indulgence, or sexual improprieties before implementing policies designed to prevent such activities in an uneasy

atmosphere. Nor do prison officials charged with managing such a volatile environment need present evidence of actual problems to justify security concerns."[16] *Fowler*, 534 F.3d at 939.

Munt's supplement related to the determination of this issue does little to change this Court's analysis. If anything, it further supports the notion that there are no exceptions to the general prohibition against hanging privacy sheets or otherwise allowing inmates to obscure their activities from view. *See* (Memo, Attached to Privacy Sheet Suppl.). Specifically, the memo provides for no exceptions to these rules and suggests that compliance must begin immediately. *See* (*id.*). Again, the lack of any cognizable exceptions strongly supports the notion that Defendants' policy against the hanging of privacy sheets is the least restrictive means of furthering the compelling interesting of preventing inmates from obstructing the view of prison staff. *Fowler*, 534 F.3d at 940–41. As a result, no reasonable jury could return a verdict for Munt on these claims and Defendants' Motion for Summary Judgment should be granted in this regard.

### b.    Shower Access

Defendants again assert that the showers are designed and monitored to further their compelling safety and security interests. *See* (Defs.' Mem. in Supp. at 18–21); (Julson Aff. ¶ 12); (Ayers Aff. ¶¶ 5, 7). Specifically, they are designed to allow prison staff to see an inmate's feet "to prevent assaults, attacks, and provide assistance in medical situations." (Defs.' Mem. in Supp. at 19); *see also* (Ayers Aff. ¶ 5) ("Officers must be able to see offenders' feet when they

---

[16]    Even if this was a dispositive element of Defendants' burden of proof, they have arguably established that obstructions heightened safety and security risks. *See* (Ex. 4, Attached to First Andreachi Aff.) (an incident report demonstrating that a privacy sheet was used in an attempt to conceal hooch); (Julson Aff. ¶ 5) ("Before MCF-STW implemented the DOC and PREA privacy sheet policies, part of offender cells used to be partially blocked. During this time, I recall numerous incidents when offenders engaged in self-injurious behavior such as cutting, offenders were attacked, raped, and some offenders committed suicide by hanging themselves directly behind the portion of the cell bars that were blocked.").

are showering. Being able to see offenders' feet is to ensure that only one offender is in a shower stall at a time."); (Quist Aff. ¶ 8) ("The officer must be able to hear if an offender is being attacked, having a medical issue, and to keep a sight line on the general area, tiers, and back corridor."); (Quist Aff. ¶ 10) ("The officers' location next to the showers complies with PREA standards to prevent rape and other attacks.").

Munt's assertion that MCF-OPH has showers that would meet his required level of privacy is relevant but not dispositive. *See Hamilton v. Schriro*, 74 F.3d 1545, 1556 n.15 (8th Cir. 1996) ("Although prison policies from other jurisdictions provide some evidence as to the feasibility of implementing a less restrictive means of achieving prison safety and security, it does not outweigh the deference owed to the expert judgment of prison officials who are infinitely more familiar with their own institutions than outside observers."). The differences between the showers at MCF-OPH and MCF-STW are a direct consequence of the difference in the prison populations at the two institutions. *Compare* (Ayers Aff. ¶ 2) ("MCF-OPH is the only Level 5 Security Correctional Facility in Minnesota."), *and* (*id.* ¶ 4) (stating at MCP-OPH "[t]here is one individual shower stall in each defendable living unit 'DLU.' A 'DLU' is a further subdivision of each living unit into smaller numbers to maintain supervision and control of the offenders"), (*id.* ¶ 6) ("MCF-OPH ensures that six to seven offenders are supervised by two to three officers whenever offenders are allowed time outside their cells."), *with* (Quist Aff. ¶ 16) ("At most, A-East has 5 officers to supervise more than 200 offenders living in that unit."). Thus the respective procedures in place at MCF-OPH and MCF-STW are a result of "the expert judgment of prison officials who are infinitely more familiar with their own institutions" and do

not substantiate Munt's claims that other least restrictive means exist to further Defendants' interests in safety and security.[17] *See Hamilton*, 74 F.3d at 1556 n.15.

In addition, Munt's request for a personal shower is a non-starter; Defendants have articulated a multitude of reasons why such an approach would be problematic. For example, "[n]one of the units at MCF-STW have this option. Remodeling one cell in A-East would go against MCF-STW policy and place a substantial burden on personnel and costs." (Quist Aff. ¶ 18); *see also* (*id.* ¶¶ 16–17) (discussing issues related to staffing requirements for allowing Munt to move between housing units (e.g., if Munt were housed in a different unit than his private shower)). Aside from the obvious concerns of arguably having to install a new private shower every time Munt were moved to a different housing unit, resourcing considerations regarding inmate oversight are not to be taken lightly. *See* (Defs.' Mem. in Supp. at 21); (Quist Aff. ¶¶ 16–18); *see also Fowler*, 534 F.3d at 939 (citing *Al–Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991)); *Al–Alamin*, 926 F.2d at 686 ("Prison administrators . . . have limited resources to provide the services they are called upon to administer.").

Finally, as discussed above in connection with *Fowler*, Defendants have suggested accommodations that they believe would satisfy Munt's concerns. For example, "A-East has a handicap shower stall that is available for any offender to use, including Plaintiff. The handicap stall is larger and its shower head is around a corner. If an offender showers in the handicap stall,

---

[17]    Furthermore, certain similarities suggest that both institutions are approaching their safety and security concerns in a consistent manner. *Compare* (Ayers Aff. ¶ 5) ("MCF-OPH shower doors are not full length doors. The shower doors have openings at the top and bottom of the door. Officers must be able to see offenders' feet when they are showering. Being able to see offenders' feet is to ensure that only one offender is in a shower stall at a time."), *with* (Quist Aff. ¶ 12) ("There is an opening at the bottom of the shower door. The officers must be able to see an offender's feet to ensure that only one offender is in the shower stall at a time . . . . Officers seated on a raised platform of the shower post must be able to see an offender's feet to prevent assaults, attacks, and provide assistance in medical situations.").

the sight of his feet would be very limited." (Defs.' Mem. in Supp. at 20) (citations omitted). In this respect, Munt again seems to be taking an all-or-nothing approach. For example, there is nothing to suggest that Munt has made use of the handicap shower at any point during this litigation. Similarly, Defendants' statement that transgendered inmates receive certain accommodations does not save Munt's claims with respect to shower access. *See* (Julson Aff. ¶ 15). Importantly, Munt does not request the same accommodation. Again he essentially seeks an all-or-nothing approach of having a private shower installed or that Defendants modify all showers to his preferred level of privacy. *See* (Compl. at 14 ¶ 6). Like the privacy-sheet analysis above, Defendants' attempts to offer alternatives that have been rebuffed by Munt suggests that Defendants' approach is the least restrictive means for furthering their compelling safety and security interests. *See Fowler*, 534 F.3d at 940–41.

At bottom, Munt's request for a private shower stall is the epitome of an excessive "religious accommodation[] . . . [that] jeopardize[s] the effective functioning of an institution." *Cutter*, 544 U.S. at 726. Likewise, his requested accommodations regarding personalize shower time, access to different showers in other housing units, or additional changes to all showers prison-wide fare no better under the holding in *Cutter*. No reasonable jury could find in favor of Munt and Defendants' Motion for Summary Judgment should be granted in this regard. *See id.*; *Fowler*, 534 F.3d at 940–41.

### c.    Double-Bunking

Exhaustion of administrative remedies is not required to be pleaded in the complaint. *See Jones v. Bock*, 549 U.S. 199, 214–17 (2007). Instead, failure to exhaust administrative remedies is an affirmative defense. *Id.* at 216. When evaluating whether administrative remedies are properly exhausted, the Court need only consider the prison's administrative process. *See Jones*,

549 U.S. at 218 (holding that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"); *see also Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (holding that proper exhaustion "demands compliance with an agency's deadlines and other critical procedural rules"). Under Minnesota Department of Corrections' policy, an inmate must attempt informal resolution through the filing of kites "as indicated by the Facility Chain of Command." Grievance Procedure, Policy No. 303.100, Minn. Dep't of Corr., http://www.doc.state.mn.us/DocPolicy2/html/DPW_Display_TOC.asp?Opt=303.100.htm (last visited Dec. 19, 2017) [hereinafter Grievance Procedure]; *see also* (Offender Handbook at 22–23) (outline of the grievance procedure). "The next step offenders must take to resolve issues related to their confinement is to submit a facility grievance." Grievance Procedure; *see also* (Offender Handbook at 22–23). If the facility grievance is unsuccessful, "[t]he final step in the offender grievance process is to submit a grievance appeal." Grievance Procedure; *see also* (Offender Handbook at 22–23). Defendants assert that

> [Munt] did not seek a single-cell occupancy restriction and first asked for a single cell restriction in his second kite to Defendant Hammer. (Doc. No. 1 at 9). Plaintiff did not mention or seek a single-cell restriction from Defendants Andreachi and Julson. (*Id.*) Plaintiff did not follow the chain of command in making this request nor did Plaintiff properly grieve this request.

(Defs.' Mem. in Supp. at 23–24); *see also* (Julson Aff. ¶ 3) (stating "[o]ne of my duties as Program Director was to respond to offender grievances."); (*id.* ¶ 9) ("I am not aware that Munt ever sent me a kite on his single cell occupancy concerns.").

While Defendants' showing in this regard is not a model of clarity, there is nothing to suggest that Munt followed proper procedure to exhaust his administrative remedies. Importantly, there is nothing in the record that demonstrates that Munt filed a proper facility grievance or a proper appeal regarding his challenge to the double-bunking policy. *See* (Julson

Aff. ¶ 9). Specifically, all kites that Munt filed are related to his challenge to the privacy sheet policy and showering accommodations; Munt's double-bunking status was challenged for the first time when Munt filed his grievance. *See* (Compl. at 7–11).

Munt argues that the exhaustion requirement was met because he received consideration on the merits. *See* (Pl.'s Mem. in Opp'n at 46–47). Munt also asserts that Defendants' conduct prevented Munt from exhausting his administrative remedies, and that Defendants' waived their affirmative defense that he failed to exhaust his administrative remedies. *See* (*id.*). None of Munt's arguments are compelling justifications for why he failed to exhaust his administrative remedies.

First, the Court has addressed Munt's waiver argument in the past, albeit in the context of whether Defendants' assertion that their conduct was in furtherance of safety and security interests. *See* (Judge Nelson's Order at 7–9); (R&R Dated Jan. 27, 2017 at 7–10). Regardless of the context, the crux of the analysis remains the same. Affirmative defenses need not be pleaded with the same pleading standards espoused in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), or *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). *See Wells Fargo & Co. v. United States*, 750 F. Supp. 2d 1049, 1051–52 (D. Minn. 2010) (Schiltz, J.) (discussing the reasons why there is no heightened pleading standard under *Ashcroft* or *Twombly* for affirmative defenses). In other words, "while a . . . defense must be asserted in a responsive pleading, it need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of Rule 8 by its **bare assertion**." *Zotos v. Lindbergh Sch. Dist.*, 121 F.3d 356, 361 (8th Cir. 1997) (internal quotation marks omitted). Here, Defendants asserted that "[s]ome of Plaintiff's claims may be barred by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e" as an affirmative defense. (Answer of Defs. Gloria Andreachi, Bruce Julson, & Bruce Resier) [Doc. No. 26 ¶ 53].

This is sufficient to preserve the exhaustion affirmative defense. *See Zotos*, 121 F.3d at 361; *see also* 42 U.S.C. § 1997e (requiring that prisoners exhaust administrative remedies before bringing suit).

Second, there is nothing to suggest that Defendants addressed the merits of Munt's requests regarding his challenge to the double-bunking policy. Specifically, the kites that gave rise to the appeal never once mentioned Munt's concerns regarding the application of the double-bunking policy to his religious beliefs. *See* (Compl. at 7–8). As a result, under the Grievance Policy, the only arguments that were arguably properly grieved were those in Munt's kites. *See* Grievance Procedure. This is further supported by Defendants' response to Munt's grievance. Importantly, Defendants only discuss those aspects of Munt's grievance relating to privacy sheet and showering accommodations. *See* (Compl. at 9–10). Defendants make no mention of Munt's request for single-occupancy status. (*Id.*). In other words, there is no decision on the merits in this regard, and Munt's assertion that *Hammett v. Cofield*, 681 F.3d 945 (8th Cir. 2012) (per curiam), applies to the exhaustion question is unpersuasive. *See* (Pl.'s Mem. in Opp'n at 46–47); *see also* 681 F.3d at 947–48 (holding that a decision on the merits of a procedurally improper grievance may exhaust an otherwise unexhausted claim for relief under the PLRA).

Third, despite Munt's assertions to the contrary, nothing in the record suggests that his failure to exhaust administrative remedies before bringing suit can be attributed to the administrative remedies being unavailable to him. *See, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850, 1858–60 (2016) (detailing situations in which administrative remedies are not "available" as required by the PLRA and therefore providing a built-in "availability" exception to the exhaustion requirement). Specifically, *Ross* requires that administrative remedies are "capable of use." *See Ross*, 136 S. Ct. at 1859. That being said, *Ross* also cautioned against administrative

remedies that are so opaque as suggest they are unavailable. *Id.* (stating "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."). That concern is not present here, notwithstanding Munt's assertion that he had no reasonable means to ascertain that he should file a single-occupancy form. *See* (Julson Aff. ¶ 9) ("Single cell assignments are highly sought after **and I frequently reviewed these requests**." (emphasis added)). That is, if prison staff frequently received single-cell occupancy requests, it strains credulity to suggest that the process is so opaque as to render the process incapable of use by an ordinary prisoner. *See Ross*, 136 S. Ct. at 1859.

Additionally, Munt is a sophisticated user of the grievance system. *See, e.g.*, (Compl. at 7–11); Exs. 1–31, Attached to Compl., *Munt v. Larson*, No. 15-cv-582 (SRN/SER) [Doc. Nos. 1-2 to 1-4] (evidencing the tens of kites and multiple grievances that Munt filed in that case). Munt should have realized it was procedurally improper for him to raise his double-bunking request in the manner in which he did (i.e., by failing to first submit kites in this regard and then include his single-cell occupancy concerns in an unrelated grievance directed to the use of a privacy sheet and concerns over shower access). *See* Grievance Procedure; (Offender Handbook at 22–23); *see also* (Compl. at 7–11). At bottom, regardless of the manner in which single-occupancy should have been requested, if Munt had properly filed a kite related to his single-cell occupancy concerns, he would have been directed to the proper manner in which to petition for a single-cell-occupancy restriction.

Thus his challenge of the Defendants' double-bunking policy is unexhausted. Where a prisoner fails to exhaust his administrative remedies, those claims must be dismissed without prejudice. *See Nash v. Lappin*, 172 F. App'x 702, 703 (8th Cir. 2006) (per curiam) (stating "we

affirm but modify the dismissal to be without prejudice."); *see also Calico Trailer Mfg. Co. v. Ins. Co. of N. Am.*, 155 F.3d 976, 978 (8th Cir. 1998) (modifying dismissal for failure to exhaust administrative remedies to be a dismissal without prejudice).

Munt's supplements directed thereto do nothing to change this Court's analysis. Importantly, the supplements are directed to subsequent incidents while Munt was incarcerated and fail to address the exhaustion question. *See generally* (Double Cell Suppl.); (Second Double Cell Suppl.); (Third Double Cell Suppl.). Even if Munt had exhausted his administrative remedies during the pendency of his litigation (which he has not alleged), exhaustion must occur before the bringing of the lawsuit in question. *See Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003) ("If exhaustion was not completed at the time of filing, dismissal is mandatory."). Based on the submissions of the parties, the Court concludes that Munt has failed to exhaust his administrative remedies related to his double-bunking concerns before filing suit, and these claims should be dismissed without prejudice.[18] *Johnson*, 340 F.3d at 627.

---

[18] Even if Munt's claims for injunctive relief regarding double-bunking are properly exhausted, Defendants would be entitled to summary judgment on the merits. Importantly, the safety and security of the prison is premised on prison officials' ability to control the movement of the inmates within. That includes the ability to regulate which prisoners are by themselves. *See* (Julson Aff. ¶ 10) (stating prison staff considers many for single-occupancy restrictions factors including: "offenders' medical and mental health history, offenders' disciplinary record, if an offender has previously been attacked by a cellmate or if the requesting offender had previously attacked his cellmates, and offenders' reasons for the single cell request").

To the extent that Defendants have made an exception to this interest—in the form of a single-cell-occupancy request—it does not contravene the Defendants' compelling interest in safety and security or suggest there is less restrictive means to achieve the same result. Specifically, Defendants aver that these single-cell-occupancy-request forms are reviewed primarily from the standpoint of whether there are safety and security reasons to grant the requested exception. *See* (Julson Aff. ¶¶ 10–11). Thus the presence of the policy generally combined with the defined exception—for which Munt has declined to apply for—demonstrates that Defendants have selected the least restrictive means to achieve their stated safety and security interests. *See Fowler*, 534 F.3d at 940–41; *see also* (Second Andreachi Aff. ¶ 6) ("Munt has not requested a single-cell occupancy restriction since he arrived at MCF-STW . . . .").

In sum, Munt's alleged RLUIPA violations that survive dismissal *sua sponte* cannot support a finding that summary judgment should be granted in his favor and Munt's Motion for Summary Judgment should be denied. Furthermore, Defendants' Motion for Summary Judgment should be granted in part and denied in part as described herein.

## III.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants Minnesota Department of Corrections, Tom Roy, Gloria H. Andreachi, Bruce Julson, Steve Hammer, and Bruce Reiser's Motion for Summary Judgment [Doc. No. 69] be **GRANTED in part and DENIED in part** as described herein;

2. Plaintiff Joel Marvin Munt's ("Munt") Motion for Summary Judgment [Doc. No. 76] be **DENIED**;

3. Munt's claims for monetary damages against Defendants for alleged violations of RLUIPA in their official capacities be **DISMISSED without prejudice** for lack of subject-matter jurisdiction;

4. Munt's claims for alleged violations of RLUIPA related to Defendants' double-bunking policy be **DISMISSED without prejudice** for failure to exhaust administrative remedies;

5. Munt's other RLUIPA claims be **DISMISSED with prejudice**; and

6. The Court decline to exercise supplemental jurisdiction over Munt's claims arising under Minnesota law and that those claims be **DISMISSED without prejudice**.

Dated: December 19, 2017

 s/Steven E. Rau
STEVEN E. RAU
United States Magistrate Judge

## Notice

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).